[No. 1410.]

FLEMING ET AL. v. DALY.

1. APPELLATE PRACTICE—ASSIGNMENT OF ERROR—EVIDENCE.
An assignment of error based on the exclusion of proper testimony and the admission of improper testimony will not be considered unless the court's attention is directed to the specific testimony excluded or admitted and the particular rulings of the trial court complained of.

2. INSTRUCTIONS.
It was not erroneous to refuse instructions asked, even though they embody correct principles of law, if the instructions given include substantially the same instructions as those refused.

3. MINING CLAIM—DISCOVERY OF VEIN—INSTRUCTIONS.
The discovery of a vein on a mining claim to be valid must be made in the discovery shaft, but where the only evidence, in a traverse suit,

in reference to the discovery was all confined to the discovery shaft and there was no pretense or claim that a discovery had been made elsewhere on the claim than in the discovery shaft, it was proper to refuse instructions from which the jury might infer that defendant was claiming a discovery outside the discovery shaft.

4. INSTRUCTIONS.

Instructions should only submit disputed questions to the jury.

5. MINING CLAIMS—DISCOVERY OF VEIN—EVIDENCE.

The discovery of a vein on a mining claim may be shown without showing that the walls of the vein were uncovered.

6. MINING CLAIMS—INSTRUCTIONS.

In a suit to determine the right of possession to a mining claim, where there was no evidence tending to show that the apex of the vein crossed the side line, it was proper to refuse an instruction submitting that question to the jury.

7. SAME.

In a suit· to determine the right of possession to a mining claim where the evidence clearly established that one of the two contestants is entitled to the possession, and the only question to determine was as to which one it belonged, the court had no right to submit to the jury the question as to whether or not both parties had failed to establish title.

*Appeal from the District Court of Gunnison County.*

Mr. S. D. CRUMP and Mr. OSCAR REUTER, for appellants.

Mr. CHARLES J. HUGHES, JR., Mr. J. M. McDOUGAL and Mr. BRANCH H. GILES, for appellee.

THOMSON, P. J.

The appellee made application in the proper land office for a United States patent to the Good Record lode mining claim, situate in Green mountain mining district, Gunnison county, Colorado. In due time the appellants, as claimants of the Only Chance mining claim, whose surface boundaries were in conflict with those of the Good Record, filed in the same land office their protest against the issuance of a patent to the appellee upon his application. Within the proper time, the appellants brought this suit against the appellee to determine the question of the right to possession of the territory

in conflict. The complaint set forth the possessory title of the plaintiffs, as claimed by them, the occupation by the defendant in virtue of the Good Record location, the application by the defendant for a United States patent and the filing by them of their adverse claim, and prayed judgment for the possession of the ground in dispute. The answer denied title in the plaintiffs, and averred a prior and superior right in the defendant to the territory in controversy. The defendant prevailed in the suit, and the plaintiffs have brought the case here by appeal.

The appellants assign for error, in a general way, the exclusion by the court of proper, competent and relevant testimony offered by them, and the admission by it of improper, irrelevant and immaterial testimony offered by the defendant. These assignments cannot be considered. They do not direct our attention to any specific testimony, excluded or admitted. They are indefinite, and leave us entirely in the dark as to the particular rulings of which they complain. The other assignments go to the withdrawal of certain evidence from the consideration of the jury, to the instructions given, and to the refusal of instructions offered by the plaintiffs. These objections will all be noticed in their order.

The Only Chance vein was discovered on the 25th day of July, 1894. There was no controversy over the fact of the time of the discovery, or over the validity of the location in so far as it embraced ground subject to location. The testimony for the defendant was that on the 14th day of June, 1894, Joseph F. Grant discovered the outcrop of a vein, and proceeded to, and did, make a location upon it in the name of the defendant, calling the location the " Good Record." Charles Gilbert, one of the plaintiffs, testified that on the 25th day of. July, 1894, he met Mr. Grant at the place where himself and his associates were working, and was told by Grant that they were on his ground, but that they should not be afraid, that he would divide the ground with them, and they should take a claim one way and he the other; and that Grant also said he would pull back the Horse Shoe stake, or the Lucky Strike

stake; whereupon they divided the distance between the two shafts, blazed a tree as the dividing line, and set up a stake, the plaintiffs to take a claim 1,500 feet west, and Grant to take a claim 1,500 feet east, Grant saying that he controlled the ground west, that he would protect the plaintiffs, and that if any one else interfered with them, or tried to take them in, he would make them a deed to the ground. The plaintiffs afterwards surveyed their claim to the westward, and laid it largely over the ground embraced in the Good Record location. Mr. Grant, as a witness for the plaintiffs, testified that when he set up the location stake on the Lucky Strike, he was acting for the defendant and a Mr. Cuenin; that he located other claims for the defendant that summer, naming some of them, and that he used his own judgment as to whether he should keep the locations up or not. In answer to a question he said that the defendant put him in charge of matters connected with the locations, but owing to the form of the question, and the form of his answer, it is impossible to tell what the particular matters were to which he referred. The theory of the plaintiffs is that in the arrangement between Grant and the plaintiff Gilbert, by which a conflict between the Only Chance claim and certain other overlapping territory was avoided, Grant acted as the agent of the defendant; that the effect of the agreement was to relinquish to the plaintiffs all ground claimed by the defendant which the plaintiffs might embrace in their survey of the Only Chance, and that as they surveyed their claim over the Good Record, the territory within that location which they included in the survey, became theirs by virtue of the agreement. The court instructed the jury to disregard all evidence concerning the division of the ground between the Only Chance and Lucky Strike claims, and the agreement between Grant and Gilbert in relation thereto, and all statements by any witness as to what the agreement was, and the plaintiffs say that, in view of the evidence, the instruction was erroneous. It is most certainly true that if the plaintiffs' theory of the facts was supported by any evidence, that evi-

dence should have been submitted to the jury, and the court had no right to withdraw it from them, or instruct them to disregard it.    To determine the effect of the agreement, on the hypothesis that Grant had authority to make it, the entire conversation must be considered; we must find what the parties were speaking about, what their attention was directed to, and within what limits the current of their talk was confined.    We can thus ascertain what their understanding was at the time, and to determine the effect of the agreement upon the defendant, on the hypothesis that one, such as counsel describe, was in fact made, we must find what, if any, evidence there was of Grant's authority to make it.

It seems that there were two claims with which the Only Chance was supposed in some manner to interfere, and with which Grant was in some way connected,—one, the Horse Shoe, and one, the Lucky Strike.    These two claims appear to have covered, in part at least, the same ground.    There seem also to have been two Lucky Strikes, an old and a new one. The names on the old Lucky Strike stake were Cuenin and Grant, and on the new, Cuenin and Daly.    How the old and the new were related to each other does not appear, nor are we able from the testimony to say with certainty which one of the claims the witnesses meant when speaking generally of the Lucky Strike.    There were only two witnesses to the conversation from which the supposed agreement was deduced, Grant and Gilbert.    Concerning the conversation generally there was no substantial disagreement between them, but, as Gilbert is one of the plaintiffs, and, presumably, did not state the case more strongly against himself than his understanding of the facts would warrant, we take his version of the occurrence.    We have already given his testimony on the subject in part.    At the same time and in the same connection, he said that the statement of Mr. Grant, that, if it became necessary to the protection of Mr. Gilbert and his associates, he would give them a deed, was made with reference to the Lucky Strike or Horse Shoe, and the deed was to be a deed of ground covered by those claims, or one or the

other of them; that he was at no time advised that anybody but Mr. Cuenin and Mr. Grant was concerned in the arrangement; that he at no time had any agreement or understanding that the Good Record was to be abandoned or deeded, or that Mr. Daly had anything to do with Mr. Grant's proposition, and that Mr. Grant never at any time agreed or claimed that he represented Mr. Daly. We do not think that the conversation, taken as an entirety, presents the smallest difficulty. It had its origin in the discovery by Grant that the plaintiffs were working upon ground in which he claimed some kind of interest. That ground belonged either to the Lucky Strike or Horse Shoe, or both. No part of it was within the boundaries of the Good Record. The ground which he proposed to divide was Lucky Strike or Horse Shoe ground, and that is the ground which was divided. The ground, in the occupation of which he proposed to protect them, was the ground he then ceded. Of necessity this must have been the case, because the parties were talking of no other ground, and were thinking of no other ground. When Grant stated that he controlled the ground west, he must have referred to the ground which was the subject of their conversation, and Mr. Gilbert, according to his own testimony, did not understand that, in any event, any part of the Good Record was to be relinquished, or any ground, except ground of Mr. Cuenin and Mr. Grant; so that he did not understand that the permission by Mr. Grant to take a claim 1,500 feet west, gave him any right to territory within the boundaries of the Good Record claim, and, considering the subject to which the conversation was strictly confined, he could not very well have so understood.

That Mr. Grant had no right or authority to make an agreement concerning the ground within the Good Record claim, even if he had assumed to make one, appears with equal conclusiveness. Grant was indebted to the defendant, and when he discovered the Good Record, he put the defendant's name on the discovery stake in consideration of the indebtedness. The defendant accepted the claim, and directed

the subsequent work upon it.  By the act of Grant the defendant acquired an inchoate title to the claim, which, upon compliance with the mining laws, would become a complete title.  That inchoate title was property, and, being in the defendant's name, could not be conveyed or relinquished without his authority.  Now the evidence is positive and uncontradicted, not only that Grant had no authority to make any agreement concerning it, but that he made no claim or pretense to such authority.  While he testified in a general way that the defendant put him in charge of matters connected with locations which he had made for the defendant, he, immediately and in the same connection, said that he had no authority to abandon claims, and that with regard to the Good Record claim, he had no authority at all; so that whatever general power he may have possessed respecting such locations, it did not extend to the Good Record claim. His testimony, and that of the defendant, who emphatically denied such authority in him, was the only evidence on the subject of the agency.  In view of the undisputed facts concerning the agreement as it was made, and concerning the ownership of the Good Record claim, the evidence of the conversation between Grant and Gilbert was immaterial and irrelevant, and in no manner affected the real controversy between the parties; and lest it might, if unnoticed, be productive of some doubt or confusion in the minds of the jury, it was the duty of the court to instruct them to disregard it.

The plaintiffs offered six instructions, which were refused. The first contained a definition of a vein or lode, and we do not see that it is open to any serious objection.  However, the court gave an instruction which was substantially the same, and which was very clear and accurate in its terms, so that the refusal of that instruction did the plaintiffs no harm. By the second and third, the court was asked to say that to make the Good Record location valid, the defendant, by the sinking of a discovery shaft to the depth of at least ten feet below the surface, must have disclosed a mineral bearing vein or lode of rock in place, and that to entitle the defendant

to the ground in dispute, as against the plaintiffs, the discovery must have been made before their rights attached. These instructions, perhaps, contained no serious misstatement of the law, but we can more satisfactorily discuss the question whether their refusal was error, by considering them in connection with the instructions on the subject of discovery which were given. The court, after saying that no location of a mining claim is valid, or has any force or effect as to the ground embraced in the location, until the discovery, at the point of location, of the vein or lode upon which the location is based, instructed the jury as follows : "Under the evidence as it now stands, and the law as given you herein, there is but one question of fact for you to determine, viz : had a vein, lode or ledge, as hereinabove defined, been discovered on the Good Record claim at the time of the discovery of Only Chance on July 25, 1894 ? Your finding on this question determines which party is entitled to the disputed premises. If in the negative, you must return a verdict for the plaintiffs ; if in the affirmative, your verdict must be for the defendant." Counsel say that this instruction was fatally defective in that it did not confine the question of discovery to the discovery shaft, or inform the jury of the legal requisites of a discovery shaft. If the objection is well taken, it follows not only that the instruction should not have been given, but that it was error to refuse the instructions requested on the same subject. The statute provides that before filing his location certificate, the discoverer shall, among other things, sink a discovery shaft upon the lode to the depth of at least ten feet below the lowest part of the rim of such shaft at the surface, or deeper, if necessary, to show a well defined crevice. Gen. Stats. sec. 2400. If, in the particular mentioned, the state statute is controlling as to the method to be pursued in locating mining claims, compliance with this provision is a prerequisite to a valid location. But so far as the sinking of a discovery shaft on the Good Record claim, and the depth to which it was sunk, within the time limited by the law, were concerned, there was no controversy. The

testimony for the defendant showed the sinking of the shaft to the required depth, within the required time, and it was nowhere disputed. It is never proper to submit to the jury, as a question for them to determine, a fact concerning which there is no disagreement. In relation to the sinking of this shaft, and the time within which it was sunk, there was nothing for the jury to consider, and the omission of instruction on those points was not error. But it is urged that because the instruction, while submitting the question of the discovery of the lode, did not submit the question of its discovery in the discovery shaft, it was erroneous. It is certainly true that, by the terms of the statute to which we have referred, the discovery must be made in the discovery shaft, and that, for the purposes of location, a discovery outside of the discovery shaft would not be sufficient, but in view of the facts before us, the question of the effect of a discovery elsewhere on the claim is not pertinent. If the dispute had been as to where the discovery was made, whether in the discovery shaft or at some other point, the question would have been directly presented, and would have demanded consideration; but here again, as to the discovery having been made in the discovery shaft, if a discovery was made at all, there was no conflict in the testimony. There was no pretense or claim by the defendant, that, at the time named in the instruction, any discovery had been made upon his claim, except in his discovery shaft. Other work was subsequently done upon the ground, but the undisputed evidence was that it was all done after that time. On the subject of discovery, the testimony for the defendant, as well as for the plaintiffs, was all directed to the question of what the discovery shaft disclosed. The defendant's witnesses testified that it was sunk in a vein of rock in place bearing gold. The witnesses for the plaintiffs testified that the shaft was sunk in country rock, and disclosed no vein. The dispute was therefore centered in the discovery shaft. Whether a vein was discovered on the outside was not in the case. If a vein was discovered at all, it was found in the discovery shaft; if it was not found

in the discovery shaft, it was not discovered at all; to determine whether a vein had been discovered, the attention of the jury was necessarily confined to the discovery shaft; and to find the discovery of a vein, they must find that it was discovered in the discovery shaft. In this state of the evidence, an instruction from which the jury might have inferred that the defendant was claiming a discovery somewhere outside of the discovery shaft, would not have been warranted by the evidence, and would have been misleading. Over the question of the discovery of the vein there was a hot dispute, but concerning its discovery in the discovery shaft, if it was discovered at all, there was no disagreement. The instruction submitted the contested question, saying nothing of the matter which, in the light of the evidence, the controversy did not touch, and, as it is only disputed matters which it is proper to leave to the jury, the instruction is not reached by counsel's criticism.

But counsel challenge the evidence of discovery as insufficient to show a compliance with the statute, in that it appeared that the discovery shaft did not expose the walls of the vein. It is clear that the walls were not found, but we do not understand that the requirements of the statute involve the uncovering of the walls. According to the testimony for the defendant, the vein was in the neighborhood of thirty feet in width, and the dimensions of the shaft were five feet by seven or eight. The shaft was sunk down in the vein, and its sides did not reach the walls. The statute does not require drifts or crosscuts from the shaft to find the walls. When the shaft is sunk to the necessary depth on the vein, the statutory condition, in that respect, is fulfilled. When a given formation is determined to be a lode, the walls are a geological necessity. Their existence is as certain as that of the vein, and the shaft, by virtue of its disclosure of the vein, shows a well defined crevice within the meaning of the law.

The plaintiffs asked the court to say that to entitle a locator to the ground within the boundaries of his location, the

apex of the vein must extend through the entire length of the claim between its side lines, but that, when the vein is disclosed upon the claim, the legal presumption is that it does so extend, and the burden is upon his adversary to prove the contrary, and, applying the principle to the case on trial, to instruct the jury that if they should find from the evidence that the apex of the vein left the side lines of the defendant's claim, his rights would terminate at the point of departure, and that in a view and inspection of the premises which the jury were about to take, it was proper for them to consider the developments and prospecting, if any, performed by the Good Record claimants upon their ground. Now, saying nothing of the propriety, in any case, of an instruction in that form, and to that purport, there was no evidence that the outcrop of the vein—which was its top or apex—left either of the side lines of the claim at any point. Such evidence as there was on the subject had a contrary tendency. What the jury's inspection revealed to them we do not know, but as the purpose of their view was to enable them intelligently to consider and weigh the testimony which they had heard, they had no right to undertake, independently, to investigate and discover supposed conditions, the existence of which the plaintiffs, on their own theory, were bound to establish, but did not even attempt to show. For more reasons than one it would have been error to give that instruction.

Counsel say that it was the duty of the court, of its own motion, to instruct the jury that if neither party to the action was found to have complied with the law in the matter of location, then neither was entitled to a verdict. The act of congress of March 3, 1881, provides that if, in any suit brought upon an adverse claim, title to the ground in controversy shall not be established by either party, the jury shall so find, and judgment shall be entered according to the verdict. 1 U. S. Rev. Stat. Supp. p. 609. The conditions which would authorize a finding that neither party had established title to the ground in controversy, or which would authorize a sub-

mission to the jury of the question whether such title had been established, did not exist in this case. The court instructed the jury that the discovery of the vein or lode on the only chance claim was legal and valid, and that the location made in pursuance of the discovery, invested the locators with title to all the ground, subject to location, which was embraced in their claim, and the instruction was fully warranted by the evidence. The defendant does not, and the plaintiffs cannot, complain of this instruction. It declared, as a matter of law that title to the ground of the only chance claim, subject to location, had been established in the plaintiffs. The whole claim was subject to location, unless the Good Record was a valid location, and prior in time. If it was, the ground in controversy would belong to it, and would not be subject to location by the plaintiffs. Therefore as to that ground the title was established in one or the other of the parties. It was the property either of the plaintiffs, or of the defendant, by a good and valid possessory title, and after the evidence was heard, the only question was, to which it belonged. The jury were compelled to find in favor of one or the other of them, and they had no right to find that it belonged to neither, and after the court had held as a matter of law that the title of the plaintiffs would hold the ground, unless that of the defendant was superior, it had no right to submit to the jury the question whether they had not both failed to establish title.

We have examined every question presented directly or indirectly by the assignment of errors, and find no reason for a reversal of the judgment.

It will therefore be affirmed.

*Affirmed.*